## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

CHARLES E. SPIVEY, III,

     *Plaintiff*,

*v.*                   CASE NO. 12-CV-10207

COMMISSIONER OF         DISTRICT JUDGE MARK A. GOLDSMITH
SOCIAL SECURITY,        MAGISTRATE JUDGE CHARLES E. BINDER

     *Defendant*.

_____/

## MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I.   RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED**, that Defendant's Motion for Summary Judgment be **GRANTED**, and that the findings of the Commissioner be **AFFIRMED**.

## II.   REPORT

### A.   Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claims for a period of disability and for Supplemental

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), the recently amended provisions of Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://jnet.ao.dcn/img/assets/5710/dir7-108.pdf. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

Security Income benefits. This matter is currently before the Court on cross-motions for summary judgment. (Docs. 11, 13.)

Plaintiff was 23 years of age at the time of the most recent administrative hearing. (Transcript, Doc. 9 at 33.) Plaintiff's employment history includes work as a laborer and as a gate guard for one year each. (Tr. at 101.) Plaintiff filed the instant claim on February 17, 2010, alleging that he became unable to work on February 17, 2010. (Tr. at 83.) The claim was denied at the initial administrative stage. (Tr. at 65.) In denying Plaintiff's claim, the Commissioner considered organic mental disorders (chronic brain syndrome) and epilepsy (major or minor motor seizures) as possible bases for disability. (*Id.*) On April 1, 2011, Plaintiff appeared before Administrative Law Judge ("ALJ") Jacqueline Hall-Keith, who considered the application for benefits *de novo*. (Tr. at 26-64.) In a decision dated April 15, 2011, the ALJ found that Plaintiff was not disabled. (Tr. at 9-19.) Plaintiff requested a review of this decision on June 18, 2011. (Tr. at 7-8.)

The ALJ's decision became the final decision of the Commissioner, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on November 21, 2011, when the Appeals Council denied Plaintiff's request for review. (Tr. at 1-6.) On January 17, 2012, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision.

**B.    Standard of Review**

In enacting the social security system, Congress created a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the determination for exceeding statutory authority or for being arbitrary and capricious. *Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 890, 107 L. Ed. 2d 967 (1990). The administrative process itself is multifaceted in that a state agency makes an initial determination that can be appealed first to the

agency itself, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142, 107 S. Ct. 2287, 96 L. Ed. 2d 119 (1987). If relief is not found during the administrative review process, the claimant may file an action in federal district court. *Id.*; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). Judicial review under this statute is limited in that the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). In deciding whether substantial evidence supports the ALJ's decision, "we do not try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility." *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'") (citing *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence")); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) (an "ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability). "However, the ALJ is not free to make credibility determinations

based solely upon an 'intangible or intuitive notion about an individual's credibility.'" *Rogers,* 486 F.3d at 247 (quoting S.S.R. 96-7p, 1996 WL 374186, at *4).

If supported by substantial evidence, the Commissioner's findings of fact are conclusive. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "there exists in the record substantial evidence to support a different conclusion." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006). *See also Mullen*, 800 F.2d at 545. The scope of a court's review is limited to an examination of the record only. *Bass,* 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers,* 486 F.3d at 241. *See also Jones*, 336 F.3d at 475. "The substantial evidence standard presupposes that there is a 'zone of choice' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (citing *Mullen*, 800 F.2d at 545).

When reviewing the Commissioner's factual findings for substantial evidence, a reviewing court must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("[a]n ALJ can consider all the evidence

4

without directly addressing in his written decision every piece of evidence submitted by a party");

*Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006).

### C.    Governing Law

The "[c]laimant bears the burden of proving his entitlement to benefits." *Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994). *Accord Bartyzel v. Comm'r of Soc. Sec.*, 74 F. App'x 515, 524 (6th Cir. 2003). There are several benefits programs under the Act, including the Disability Insurance Benefits ("DIB") program of Title II, 42 U.S.C. §§ 401 *et seq.*, and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. §§ 1381 *et seq.* Title II benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty stricken adults and children who become disabled. F. Bloch, Federal Disability Law and Practice § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means:

> inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe

impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

Step Four: If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

Step Five: Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston,* 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin,* 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his] impairments and the fact that [he] is precluded from performing [his] past relevant work[.]" *Jones*, 336 F.3d at 474 (cited with approval in *Cruse,* 502 F.3d at 540). If the analysis reaches the fifth step without a finding that the claimant is not disabled, the burden transfers to the Commissioner. *Combs v. Comm'r*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [claimant] could perform given [his] RFC [residual functional capacity] and considering relevant vocational factors." *Rogers,* 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

The ALJ applied the Commissioner's five-step disability analysis to Plaintiff's claim and found at step one that Plaintiff had not engaged in substantial gainful activity since February 17, 2010, the application date. (Tr. at 14.) At step two, the ALJ found that Plaintiff's seizure disorder, attention deficit hyperactivity disorder (ADHD), learning disorder and/or mild retardation, and residuals from gunshot wound to the abdomen were "severe" within the meaning of the second

sequential step. (Tr. at 14.) At step three, the ALJ found no evidence that Plaintiff's combination of impairments met or equaled one of the listings in the regulations. (Tr. at 14-15.) At step four, the ALJ found that Plaintiff could perform his past relevant work as a gate guard. (Tr. at 18-19.) Alternatively, at step five, the ALJ found that Plaintiff retains the residual functional capacity to perform a limited range of sedentary work. (Tr. at 16-18.) Therefore, the ALJ found that Plaintiff was not disabled. (Tr. at 19.)

### E.   Administrative Record

A review of the relevant medical evidence contained in the administrative record indicates that Plaintiff was incarcerated for unarmed robbery in 2006 and then again for a parole violation in 2008. (Tr. at 309.) On August 21, 2008, while in prison, Plaintiff was assessed with cannabis abuse and a GAF score of 60. (Tr. at 237.) On September 17, 2008, Plaintiff was "the assaulter" in an altercation on the prison's basketball court; he sustained an abrasion on his left hand. (Tr. at 241.) Plaintiff was referred to as having "mild mental retardation." (Tr. at 250.) Plaintiff requested an appointment with a psychologist "because of issues regarding anger and custody." (Tr. at 262.) On September 29, 2008, Plaintiff reported that he was "sexually assaulted by a lunch room worker" at the prison, "resulting in the fighting ticket he receive[d] a few weeks ago." (Tr. at 277, 281.)

Plaintiff continued to be assessed while in prison. On October 8, 2008, Plaintiff was diagnosed with a learning disorder and mild mental retardation; he was assessed a GAF score of 58. (Tr. at 301.) On December 22, 2008, Plaintiff was assessed with mild mental retardation and anoxic brain injury secondary to umbilical cord strangulation which occurred at birth. (Tr. at 310.) On April 2, 2009, Plaintiff was assessed with a learning disorder and mild mental retardation, and was again assessed a GAF score of 58. (Tr. at 319.) It was noted that Plaintiff was not taking any

medication. (Tr. at 320.) On June 15, August 18, September 18, and October 29, 2009, Plaintiff was given the same diagnoses and it was noted that he was not taking any medications. (Tr. at 331, 339, 351, 381.) On August 18, 2009, it was noted that Plaintiff's "memory skills were good," "he displayed good concentration and attention to task," his "comprehension and judgment were fair, and his ability to view abstractions was good." (Tr. at 343-44.) On October 29, 2009, it was noted that his prognosis was "good with continued family support and employment." (Tr. at 381.) Although Plaintiff was depressed at times while in prison, he was never considered at risk for suicide. (Tr. at 377.)

Plaintiff received 16 prison misconduct tickets between 2006 and 2009; he was released in 2010. (Tr. at 343, 388.)

On April 27, 2010, Plaintiff was examined by Disability Determination Services ("DDS") psychologist Terrance Mills, Ph.D., who diagnosed "Attention Deficit Disorder/Hyperactivity Disorder" and "Mild Mental Retardation per records," and assessed a GAF score of 45 to 50 with a "poor" diagnosis. (Tr. at 402.) Plaintiff was assessed with a verbal IQ of 54 (mild to moderate retardation), Performance IQ of 55 (mild to moderate mental retardation), and a full scale IQ of 50. (Tr. at 401-02.) However, Dr. Mills "believe[d] that claimant was not being cooperative with testing and noted that his past IQ scores in 1998 and 2004 were full scale IQ of 64 and 70, verbal IQ of 67 and 75, and performance IQ of 67 and 70." (Tr. at 402.) In addition, Dr. Mills stated that Plaintiff "may be faking illness. He wants to say he has bipolar disorder. There is no evidence in his records from prison that he was diagnosed with bipolar disorder." (Tr. at 402.)

A Psychiatric Review Technique completed on May 21, 2010, by George Starrett, Ed.D., diagnosed Plaintiff with organic mental disorders, i.e., ADHD and Borderline Intellectual Functioning. (Tr. at 403-04.) Plaintiff was found to be moderately limited in maintaining

concentration, persistence or pace and mildly limited in activities of daily living and in maintaining social functioning. (Tr. at 413.) It was noted that Plaintiff's statements were "not fully credible, as he didn't put forth full effort on IQ testing. His current scores are much lower than prior scores in file . . . . His IQ scores are likely not valid, given his limited effort during the testing session." (Tr. at 415.) Therefore, the assessment concluded that Plaintiff was "able to maintain simple repetitive tasks." (*Id.*)

A Mental Residual Functional Capacity ("RFC") Assessment completed on the same day concluded that Plaintiff is moderately limited in his ability to understand and remember detailed instructions, ability to carry out detailed instructions, ability to maintain attention and concentration for extended periods, ability to work in coordination with or proximity to others without being distracted by them, and ability to complete a normal workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, but was otherwise not significantly limited in understanding, memory and concentration, and persistence. (Tr. at 417-18.) Plaintiff was also found to be moderately limited in the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes but was otherwise not significantly limited in social interaction or adaptation. (Tr. at 418.)

On August 21, 2010, Plaintiff was treated for a gunshot wound to the abdomen at the Henry Ford Hospital by Thomas Knuth, M.D. (Tr. at 421-27, 439-45.) On January 27, 2011, it was noted that his wound was "well healed" and that he "had an ostomy reversal" performed on January 7, 2011, and "has been doing well." (Tr. at 440.) Dr. Knuth stated that Plaintiff "appears to be recovering fully from his surgeries" and was "advised to see us on an as need [sic] basis." (*Id.*)

Plaintiff testified at the administrative hearing that he understood he had a right to be represented by an attorney or someone else and that he chose to proceed without a representative. (Tr. at 29.) In addition, he signed a waiver form before the hearing. (*Id.*) The ALJ acknowledged that Plaintiff submitted additional medical records the morning before the hearing. (Tr. at 29-30.) The ALJ explained the process and Plaintiff indicated that he also brought an additional witness besides himself, i.e., his mother Tanya Spivey. (Tr. at 30-32.)

Plaintiff testified that he has two daughters who at that time were four and six years old. (Tr. at 33.) Plaintiff stated that he was able to read and answer the questions on the driver's license test, that he cannot read big words but can read a newspaper, and that he can add, subtract, multiply and "divide a little bit." (Tr. at 34.) Plaintiff explained that when he was in high school he attended a masonry program and obtained a certificate to lay bricks. (Tr. at 35.) Plaintiff indicated that the last time he worked was when he took care of elderly people in 2008. (Tr. at 36.) When asked whether he was trying to look for work, Plaintiff responded in the affirmative; when asked what happened, Plaintiff stated that he "never got a call." (Tr. at 36.) When asked what type of work he was looking for, Plaintiff responded, "construction because since I had the masonry[.]" (Tr. at 37.)

Plaintiff testified that he was in special education classes when he was in school, but that he did not know why, although he added that he was on medication for ADD and was "just a slow learner." (Tr. at 37.) School records indicate that in 2004 Plaintiff was assessed with a standard IQ of 67 (with a 90% confidence interval ranging from 63 to 75), a performance or nonverbal score IQ of 67 (90% confidence interval ranging from 63 to 75), and a full scale standard score IQ of 64 (90% confidence interval ranging from 61 to 70). (Tr. at 164.) The assessment found Plaintiff to be "functioning within the Extremely Low range of cognitive development compared to a cohort

of his peers." (*Id.*)[2] Therefore, Plaintiff was considered eligible for special education and related services. (Tr. at 165.) He was placed in the least restrictive environment, i.e., he fully participated with students in general education, was fully involved in and progressed in the general curriculum and had the same opportunities as students in the general education program with respect to nonacademic and extracurricular activities. (Tr. at 157.) In addition, the stated objectives almost exclusively involved behavioral issues, rather than academic issues, e.g., that Plaintiff would "cooperate with authority/follow a directive[,]" "express angry feelings to adults in a non-abusive manner[,]" "attend all scheduled classes in a timely manner[,]" "admit responsibility for behavior in a conflictual [sic] situation[,]" and "demonstrate problem solving skills by discussing/attempting possible alternatives." (Tr. at 158.) His only academic goals were to learn to multiply two-digit numbers, "division problems involving more than one step," and to "improve reading comprehension." (Tr. at 159.)

Plaintiff stated that he does not currently take any medication for ADD but that he has taken "seizure disorder" medication since he was incarcerated. (Tr. at 37-38.) Plaintiff explained that the seizure medication "was making me sick, like it seemed like when I would take it, I would fall in seizures. Like when I was in 2008, I was at Dixon and I had took the medicine and I got into a seizure in the shower." (Tr. at 38.) Plaintiff indicated that he later refused the medication and has not had a seizure since the 2008 incident at Dixon. (Tr. at 39-40.) He also had not been treated for nor had he taken medication for seizures since that time. (Tr. at 40.)

Plaintiff also testified that he suffered a gunshot wound to the abdomen which resulted in nerve damage to his right side. He stated, "my thigh, my testicles, my nerves are real bad and my legs will go out on me . . . . I take showers with a shower chair, because I can't stand up in the

---

[2] A previous assessment at Wayne State showed Plaintiff was "functioning in the mentally impaired range of intellectual ability" and diagnosed Attention Deficit Hyperactivity Disorder. (Tr. at 181.)

shower that long." (Tr. at 40-41.) Plaintiff further testified that he lives alone but that his mother comes over and helps with cooking and cleaning. (Tr. at 41.) Plaintiff was using a walker at the hearing; when asked why, Plaintiff stated, "Because I can't walk. My legs go out on me." (Tr. at 41.) When asked how long he planned to use the walker, Plaintiff stated, "Until my nerves heal up or when I can get to walking a little better." (Tr. at 41-42.)

When asked how his concentration is, Plaintiff responded, "It's okay." (Tr. at 42.) When asked how his energy and self esteem were, Plaintiff responded, "Not so good" and "Not good[,]" respectively. (Tr. at 42.) Plaintiff stated that his pain medication brings the pain down from an eight to a four on a scale of one to ten. (Tr. at 43.) Plaintiff also stated that he can only walk for less than half a block, but that he can sit "for a while" but that he needs to stretch his leg out or "it'd be cramping." (Tr. at 44.) Plaintiff stated that lifting his fifty-pound daughter causes pain but that he can lift twenty-five or thirty pounds. (Tr. at 45.) Plaintiff stated he could bench press 150 pounds, but said he could lift around twenty pounds if he were sitting down at a job. (Tr. at 46.) Plaintiff further stated he as no problems with his upper extremities and that he could push, pull or operate a foot control only with his left leg. (Tr. at 46-47.) Plaintiff also testified that he is able to shower and get dressed by himself without any assistance, other than using the shower chair. (Tr. at 48.) Plaintiff also cooks and washes dishes "sometimes," but his mother also helps with these tasks. (*Id*.) Plaintiff testified that "[s]ometimes I'll sit in the house and sometimes I'll go over to my brother['s] house . . . or I'll go over to my mother's house. I don't go to like no events or nothing like that." (Tr. at 49.) Plaintiff also watches television. (Tr. at 50.) He testified that he used to smoke marijuana but that he has not used marijuana or alcohol for three years because he is on parole and has to provide urine specimens on a regular basis. (Tr. at 50-51.)

When asked to summarize his physical impairments, the ALJ asked if Plaintiff's impairment was based on his gunshot wound and Plaintiff responded in the affirmative. Plaintiff specifically acknowledged that he was not having seizures or any problems with ADHD and was not receiving any treatment for either of these conditions. (Tr. at 51.) When the ALJ asked if Plaintiff had any other physical problems, Plaintiff stated, "no, ma'am." (*Id.*) Plaintiff's mother, Tanya Spivey, also testified. (Tr. at 52-57.)

Plaintiff's past work for Lifetime Fitness involved signing in trucks and was classified as a gate guard. The vocational expert ("VE") testified that the job of gate guard is "classified by the DOT as light and semi-skilled, [but that it was] sedentary as performed" by Plaintiff in his past job. (Tr. at 61.) The VE also testified that the DOT gives the usual gate guard job an "SVP of 3 [but that,] [i]n my experience, it's been unskilled work." (Tr. at 61-62.)

The ALJ asked the VE to assume a person with Plaintiff's background who has "less than a high school education, but no difficulties with communication; the similar residual functional capacity to perform unskilled work, simple instructions or directions; can follow simple directions, presumably one/two/three-step activities. And, based on this gunshot would to his abdomen, we'll put him at sedentary." (Tr. at 62.) The VE testified that such a person could perform Plaintiff's past work as a gate guard and that there are 600 such jobs in Southeastern Michigan that are performed at the sedentary level. (*Id.*) In addition, the VE testified that such a person could perform the 1,500 sorter and 3,000 bench assembler jobs, as well as the 1,600 surveillance system monitor jobs available in Southeastern Michigan. (Tr. at 62.) The VE also testified that there are 1,300 ticket taker or lobby attendant jobs that "are classified in the DOT as falling at light. However, it's been my experience that many would fall within this RFC[,]" i.e., 1,300. (Tr. at 62-63.)

**F.      Analysis and Conclusions**

**1.      Legal Standards**

The ALJ concluded that Plaintiff was capable of returning to his prior work as a gate guard. The Commissioner's regulations state that the agency "will first compare our assessment of your residual functional capacity with the physical and mental demands of your past relevant work." 20 C.F.R. § 416.960(b); 20 C.F.R. §404.1560(b). "If you can still do this kind of work, we will find that you are not disabled." 20 C.F.R. § 404.1520(f); 20 C.F.R. § 404.1560(b)(3). "'By referring to the claimant's ability to perform a "kind" of work, [the regulations] concentrate[] on the claimant's capacity to perform a type of activity rather than [her] ability to return to a specific job or to find one exactly like it.'" *Boucher v. Apfel*, No. 99-1906, 2000 WL 1769520, at *7 (6th Cir. Nov. 15, 2000) (quoting *Pass v. Chater*, 65 F.3d 1200, 1204 (4th Cir. 1995)).

An "ALJ [is] not required to solicit testimony from a VE in reaching his conclusion" that a plaintiff is able to perform her past relevant work. *Wright-Hines v. Comm'r of Soc. Sec.*, 597 F.3d 392, 395 (6th Cir. 2010) (citing 20 C.F.R. § 404.1560(b)(2) ("We *may* use the service of vocational experts . . . to help us determine whether you can do your past relevant work[.]") (emphasis in original); *Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007) ("The regulations permit an ALJ to use the services of a vocational expert at step four to determine whether a claimant can do his past relevant work . . . .")). Should the ALJ use the services of a VE, the ALJ need only incorporate those limitations into the hypothetical question that he finds credible and supported by the record. *Casey v. Sec'y of Health and Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993).

As noted earlier, the ALJ determined in the alternative that Plaintiff retained the residual functional capacity to perform a limited range of sedentary work. (Tr. at 16-18.) Sedentary work

14

involves lifting no more than ten pounds at a time and occasionally lifting and carrying articles like docket files, ledgers and small tools. Although a sedentary job is defined as one that involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 404.1567(a)(1991). Social Security Ruling 83-10 clarifies this definition:

> "Occasionally" means occurring from very little up to one-third of the time. Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8-hour workday, and sitting should generally total approximately 6 hours of an 8-hour workday. Work processes in specific jobs will dictate how often and how long a person will need to be on his or her feet to obtain or return small articles.

SSR 83-10.

After review of the record, I suggest that the ALJ utilized the proper legal standard in his application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to the consideration of whether substantial evidence supports the ALJ's decision.

### 2.    Substantial Evidence

Plaintiff contends that the ALJ's decision is not supported by substantial evidence. As noted earlier, if the Commissioner's decision is supported by substantial evidence, the decision must be affirmed even if this Court would have decided the matter differently and even where substantial evidence supports the opposite conclusion. *McClanahan,* 474 F.3d at 833; *Mullen,* 800 F.2d at 545. In other words, where substantial evidence supports the ALJ's decision, it must be upheld.

Specifically, Plaintiff contends that: (1) the ALJ did not meet her heightened duty to fully and fairly develop the record since Plaintiff was unrepresented at the hearing (Doc. 11 at 7-10); (2) the ALJ's findings at Step Three are not supported by substantial evidence based on Plaintiff's IQ scores and the fact that his RFC is limited to sedentary work (Doc. 11 at 10-13); (3) the residual functional capacity ("RFC") and hypothetical questioning did not adequately portray Plaintiff's

limitations caused by his severe impairments (Doc. 11 at 13-15); and (4) the ALJ failed to meet her duty to fully develop the record under SSR 00-4p because she did not ask the VE whether her testimony was consistent with the Dictionary of Occupational Titles ("DOT"), especially where the VE testified that the ticket taker and lobby attendant jobs were within the "light" classification but that it has "been my experience that many would fall within this RFC." (Dco. 11 at 15-16, Tr. at 62.)

### a.    Full and Fair Record

Plaintiff contends that the ALJ did not meet her heightened duty to fully and fairly develop the record since Plaintiff was unrepresented at the hearing. (Doc. 11 at 7-10.)  Plaintiff argues that the ALJ was aware that Plaintiff was attempting to engage a lawyer because his mother testified that she thought Plaintiff had a lawyer. (Doc. 11 at 8; Tr. at 52-54.)

I note that the "burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination, rests with the claimant." *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) (citing 20 C.F.R. §§ 416.912, 416.913(d)). "Only under special circumstances, when a claimant is without counsel, not capable of presenting an effective case, and unfamiliar with hearing procedures does the ALJ have a special duty to develop the record." *Rise v. Apfel, Comm'r of Soc. Sec.*, No. 99-6164, 2000 WL 1562846, at *2 (6th Cir. 2000) (citing *Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051-52 (6th Cir. 1983)). The special circumstances only arise when the plaintiff is not only unrepresented and unfamiliar with the process, but is also not capable of presenting an effective case.  I find that although Plaintiff was not represented, there is absolutely no evidence that he was unable to present an effective case.

16

Plaintiff was prepared for the hearing, had signed the waiver of representation form beforehand, and testified consistently to his desire to proceed unrepresented, Plaintiff told the ALJ he brought an additional witness and called the witness (his mother), and Plaintiff even supplemented the record by bringing additional medical records before the hearing. (Tr. at 29-32.) I suggest that Plaintiff's reference to one page in the transcript where Plaintiff does not appear to answer the question properly because he answers "yes" to a multiple option question (Tr. at 55,) does not undermine the bulk of the record wherein Plaintiff appropriately answers the ALJ's questions, seeking clarification when needed. I therefore suggest that there were no special circumstances placing a heightened duty on the ALJ to fully and fairly develop the record.

I further suggest that even if the ALJ had a heightened duty, Plaintiff has not pointed to any alleged failure of that duty that could have harmed Plaintiff. "Where a claimant seeking judicial review argues that the ALJ failed to fully and fairly develop the record, a court will remand only if the claimant can demonstrate that she was prejudiced...To establish prejudice, the claimant must point to specific facts that the ALJ did not consider and show that those facts would have been relevant to the ALJ's determination." *Czibor v. Astrue*, No. 12C 1678, 2012 WL 4361554, at *7 (N.D. Ill. Sept. 20, 2012), *citing Nelms v. Astrue*, 553 F.3d 1039, 1098 (7th Cir. 2008). Mere conjecture is insufficient. *Binon v. Shalala*, 13 F.3d 243, 246 (7th Cir. 1994).

In the instant case, the only errors resulting from this lack of representation that Plaintiff alleges are that the ALJ relied on Plaintiff's description of his past work as being substantial gainful activity and that the ALJ confused Plaintiff into testifying that the only impairment that limited his ability to work was the resulting impairment from his gunshot wound when Plaintiff also suffered from cognitive impairments. (Doc. 11 at 9-10.) First, the ALJ considered not only the physical impairments but also thoroughly considered the mental and cognitive impairments,

17

including Listing 12.05; thus, any absence of representation did not cause mental or cognitive impairments to be overlooked. (Tr. at 14-19.)  Furthermore, reliance on Plaintiff's own description of his past work as being substantial gainful activity could not have harmed Plaintiff because even if the ALJ's Step Four analysis were flawed, the ALJ made the alternative requisite findings at Step Five.  I therefore suggest that any alleged failure on the part of the ALJ was harmless error. *DeKruger v. Comm'r of Soc. Sec.*, No. 08-10410, 2009 WL 596123, at *12 (E.D. Mich. Mar. 9, 2009)("even though Plaintiff's job as a companion does not appear to rise to the level of SGA at step four, and thus, should not be considered past relevant work, this Court should still affirm the Commissioner's finding, because the record and the ALJ findings support a step five determination that Plaintiff is not disabled."); *Lopez v. Comm'r of Soc. Sec.*, No. 1:11-cv-00310 GSA, 2012 WL 1434991, at *15 (E.D. Cal. Apr. 25, 2012)("even if the ALJ erred in determining Plaintiff could perform his past relevant work because that work did not amount to substantial gainful activity, any error is harmless" where ALJ made proper Step Five findings); *Gay v. Astrue*, No. 2:11-cv-659-TFM, 2012 WL 1165104, at *8 (M.D. Ala. Apr. 6, 2012)("the court concludes that any alleged error based on analysis involving Gay's [past relevant work' is harmless because of the ALJ's alternative finding that Plaintiff's residual functional capacity for a full range of medium work allowed for the determination that Plaintiff was not disabled."); *see also Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005)("A decision of the ALJ will not be reversed for errors that are harmless."); *Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983)(harmless error doctrine applies in social security cases).  I further suggest that Plaintiff is not entitled to any relief on this ground because he has failed to "point to specific facts that the ALJ did not consider and show that those facts would have been relevant to the ALJ's determination." *Czibor; Nelms.*

   **b.    Step Three Findings**

Plaintiff also argues that the ALJ's findings at Step Three under Listing 12.05(C) are not supported by substantial evidence based on Plaintiff's IQ scores and the fact that his RFC is limited to sedentary work. (Doc. 11 at 10-13.)

The Sixth Circuit has held that in order to meet a Listed Impairment under 12.05, a plaintiff must satisfy the diagnostic description or definition as well as the severity requirements listed in subsections (A) through (D). 20 C.F.R. § 404.1520, Subpart P, App. 1, listing 12.05; *Foster v. Haller*, 279 F.3d 348, 354-55 (6th Cir. 2001).

To meet listing 12.05(C), a claimant must show that: (1) he experiences significantly subaverage general intellectual functioning with deficits in adaptive functioning that initially manifested during the developmental period (i.e., before the age of twenty-two); (2) he has a verbal, performance, or full scale IQ of 60 through 70; and (3) he suffers from a physical or other mental impairment imposing an additional and significant work-related limitation on function. *Turner v. Comm'r of Soc. Sec.,* 381 F. App'x 488, 491 (6th Cir. 2010). "Adaptive functioning includes a claimant's effectiveness in areas such as social skills, communication, and daily living skills." *West v. Comm'r of Soc. Sec.*, 240 F. App'x 692, 698 (6th Cir. 2007). IQ scores alone are insufficient to satisfy Listing 12.05(C). *Blanton v. Soc. Sec. Admin.*, 118 F. App'x 3, 7 (6th Cir. 2004) ("two IQ scores of 70, without more, does not satisfy the requirements of listing 12.05(C)").

Although Plaintiff has been assessed with IQ scores within the range needed under Listing 12.05(C) (Tr. at 164, 402),[3] the ALJ's finding that Plaintiff failed to satisfy the remaining criteria

---

[3] I note that the ALJ's finding that Plaintiff failed to meet the IQ criteria does have support in the record, i.e., Dr. Mills "believe[d] that claimant was not being cooperative with testing and noted that his past IQ scores in 1998 and 2004 were full scale IQ of 64 and 70, verbal IQ 67 and 75, and performance IQ of 67 and 70....[and that Plaintiff] may be faking illness." (Tr. at 402.) In addition, Dr. Starrett concluded that Plaintiff's statements "are not fully credible, as he didn't put forth full effort on IQ testing. His current scores are much lower than prior scores in file...His IQ scores are likely not valid, given his limited effort during the testing session." (Tr. at 415.) "The ALJ may choose to disregard IQ scores that would normally lead to a finding of disability when those scores were undermined by a doctor's evaluation." *Dragon v. Comm'r of Soc. Sec.*, No. 09-4489, 2012 WL 987758, at *7 (6th Cir. Mar. 26, 2012). However, for purposes of this Report, I will assume the IQ scores fit within the requisite range.

is supported by substantial evidence. (Tr. at 14-15.)  Even assuming, *arguendo*, that Plaintiff's limitation to sedentary work satisfies the third criteria, there is no evidence to satisfy the first, i.e., that Plaintiff experiences deficits in adaptive functioning. *Turner, supra.*  As noted by the ALJ, Plaintiff "engages in various activities, lives alone, and has been able to perform unskilled work in the past." (Tr. at 15.)  In addition, although Plaintiff was also found to be moderately limited in the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes, he was otherwise found to not be significantly limited in social interaction or adaptation. (Tr. at 418.)  In addition, although Plaintiff was found eligible for special education services, he also fully participated with students in general education, was fully involved in and progressed in the general curriculum and had the same opportunities as students in the general education program. (Tr. at 157.)  In addition, the stated objectives for his education almost exclusively involved behavioral issues rather than academic issues. (Tr. at 158-59.)  Finally, Plaintiff's own description of his daily activities is further evidence of a failure to meet or equal Listing 12.05(C). I therefore suggest that  substantial evidence supports the ALJ's finding that there was insufficient evidence of deficits in adaptive functioning or additional and significant work-related limitation on function necessary to meet or equal listing 12.05(C). *See Potter v. Comm'r of Soc. Sec.*, 223 F. App'x 458, 465 (6th Cir. 2007) (although the plaintiff provided evidence of IQ of 69, evidence that the plaintiff's activities of daily living were only mildly limited and that he was only moderately limited in maintaining concentration, persistence or pace supported ALJ's finding that the plaintiff did not meet Listing 12.05); *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001) (affirming ALJ's conclusion that Plaintiff had not met Listing 12.05 where evidence of onset before age 22 was merely that the plaintiff had completed school through the ninth grade in exclusively special education classes, and where the plaintiff had worked as a clerk at a bank and a store).

20

### c.     RFC Analysis

Plaintiff further contends that the ALJ's RFC analysis and resulting hypothetical questioning did not adequately portray Plaintiff's limitations caused by his severe impairments. (Doc. 11 at 13-15.)  First, the ALJ incorporated Plaintiff's complaints regarding the resulting impairments from his gunshot wound by limiting Plaintiff to sedentary work. (Tr. at 16.)  Second, the ALJ incorporated the only record evidence as to limitations based on Plaintiff's mental impairments and limited Plaintiff to unskilled work involving only 1-2-3 step tasks. (Tr. at 16, 415.)  Further record evidence does not reveal disabling impairment.  On August 18, 2009, it was noted that Plaintiff's "memory skills were good and he displayed good concentration and attention to task...His comprehension and judgment were fair, and his ability to view abstractions was good." (Tr. at 343-44.)  On October 29, 2009, it was noted that his "[p]rognosis is good with continued family support and employment." (Tr. at 381.)  Plaintiff's only physical impairment, the gunshot wound to his abdomen, was "well healed" and Dr. Knuth stated that Plaintiff "is doing well and appears to be recovering fully from his surgeries[.]" (Tr. at 440.)  Plaintiff was not even set up for any course of treatment but rather Dr. Knuth indicated Plaintiff could come in to the office on an "as need[ed]" basis. (*Id.*)

Although Plaintiff was taking medication for ADHD at times, in more recent years, Plaintiff has not taken any medication nor has he been hospitalized or received any services for any mental impairments. (Tr. at 320, 331,  339, 351, 381.)  Such modest treatment is inconsistent with a finding of disability. *See Helm v. Comm'r of Soc. Sec.*, 405 F. App'x 997, 1001 (6th Cir. 2011); *Myatt v. Comm'r of Soc. Sec.*, 251 F. App'x 332, 334-35 (6th Cir. 2007).

Finally, the RFC analysis properly incorporated the limitations found in the RFC assessment and was in harmony with the objective record medical evidence and Plaintiff's own statements that

he was able to read and answer the questions on the driver's license test, that he cannot read big words but can read a newspaper, he can add, subtract, multiply and "divide a little bit[,]" he was able to complete a masonry program and obtained a certificate to lay bricks, worked before going to prison, was looking for work in construction at the time of the hearing, watches televison, is able to shower and get dressed by himself without any assistance, other than using the shower chair, cooks "sometimes" and "sometimes" does the dishes, and visits with family. (Tr. at 34-37, 48-50.) *See Griffeth v. Comm'r of Soc. Sec.*, 217 F. App'x 425, 429 (6th Cir. 2007); *Varley v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987).

   **d.     Dictionary of Occupational Titles**

   Plaintiff contends that the ALJ failed to meet her duty to fully develop the record under SSR 00-4p because she did not ask the VE whether her testimony was consistent with the DOT, especially where the VE testified that the ticket taker and lobby attendant jobs were within the "light" classification but that it has "been my experience that many would fall within this RFC." (Doc. 11 at 15-16, Tr. at 62.)

   As noted earlier, an "ALJ [is] not required to solicit testimony from a VE in reaching [her] conclusion" that a plaintiff is able to perform his past relevant work. *Wright-Hines, supra.* Therefore, I suggest that there can be no error regarding the VE with respect to the ALJ's findings that Plaintiff f could return to his past work. As to the VE's testimony under the ALJ's alternative analysis that  Plaintiff could perform a limited range of sedentary work, I further suggest that there was no error. Although the ALJ did not state the magic incantation, "is your testimony consistent with the DOT," the VE referred to DOT categorizations and the conversation between the ALJ and the VE expressly addressed potential conflicts with the DOT, i.e., the VE's testimony that there are 1,300 ticket taker or lobby attendant jobs that "are classified in the DOT as falling at light" but

"it's been my experience that many would fall within this RFC." (Tr. at 62-63.) I suggest that the ALJ's discussions with the VE satisfied Social Security Ruling 00-4p. *See Martin v. Comm'r of Soc. Sec.*, 170 F. App'x 369, 375-76 (6th Cir. 2006).

Even if the ALJ's discussion with the VE did not satisfy Ruling 00-4p as to the classification of the ticket taker and lobby attendant jobs challenged by Plaintiff, the VE's testimony regarding the 1,500 sorter and 3,000 bench assembler jobs, as well as the 1,600 surveillance system monitor jobs available in Southeastern Michigan (Tr. at 62) remains unchallenged and would, by itself, provide substantial evidence for the ALJ's conclusion that Plaintiff was not disabled. *See Martin v. Comm'r of Soc. Sec.*, 170 F. App'x 369, 374 (6th Cir. 2006) (noting that the ALJ had no affirmative duty to investigate whether the VE was correct where the plaintiff did not bring any conflict to his attention, and finding substantial evidence satisfied where "even if the two positions about which there were inconsistencies had been excluded, the ALJ still could have found that [the plaintiff] could perform the third position"). I therefore suggest that this argument does not undermine the ALJ's decision.

### 3.    Conclusion

For all these reasons, after review of the record, I conclude that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "zone of choice within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035, as the decision is supported by substantial evidence.

### III.    REVIEW

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1).

Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan,* 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan*, 474 F.3d at 837; *Frontier Ins. Co.,* 454 F.3d at 596-97. Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be concise, but commensurate in detail with the objections, and shall address specifically, and in the same order raised, each issue contained within the objections.


                                     s/ 𝕮𝖍𝖆𝖗𝖑𝖊𝖘 𝕰 𝕭𝖎𝖓𝖉𝖊𝖗
                                     CHARLES E. BINDER
Dated: December 19, 2012             United States Magistrate Judge


### CERTIFICATION

I hereby certify that this Report and Recommendation was electronically filed this date and served upon counsel of record via the Court's ECF System.

Date:  December 19, 2012                    By     s/Patricia T. Morris
                                            Law Clerk to Magistrate Judge Binder